UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| EUGENE RAY BABCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00033-JPH-MJD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**POST-TRIAL FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Ray Babcock has sued the United States for negligence in violation of the Federal Tort Claims Act ("FTCA"). Mr. Babcock alleges that, while in federal custody with the United States Bureau of Prisons ("BOP") a few months after a hip replacement surgery, he fell twice in the shower and did not receive adequate medical care, causing him unnecessary pain and to need a subsequent hip revision surgery.

On May 6–7, 2021, the Court held a bench trial on these claims.[1] For the reasons explained in the following findings of fact and conclusions of law, Mr. Babcock has not shown that the BOP was negligent, so his claim for relief under the FTCA is denied.

---

[1] The Court appointed Kathleen Matsoukas and Allison Scarlott to represent Mr. Babcock through trial and entry of final judgment. *See* dkt. 65; dkt. 82. They provided Mr. Babcock with excellent representation. The Court expresses its gratitude to Ms. Matsoukas and Ms. Scarlott for accepting the appointment and for their service to the Court.

# I.
# Background

In 2005, Ray Babcock was injured while operating a forklift on the job, requiring neck surgery, a right-hip replacement, and ankle surgery.  He received workers compensation and disability benefits after this accident.  On March 9, 2016, Mr. Babcock, who was then in his late fifties, had surgery to replace his arthritic left hip.  *See* dkt. 125 at 1 (Stipulation ¶ 1); Ex. 2 at 191–92.

After being sentenced to 28 months' imprisonment in the BOP, s*ee* Ex. 6 at 4–5, Mr. Babcock reported to the Terre Haute Federal Correctional Institution ("FCI Terre Haute") on June 16, 2016; was transferred to a residential reentry center on December 14, 2017; and was released from BOP custody on June 6, 2018.  *See* dkt. 125 at 1 (Stipulation ¶¶ 4–6); Ex. 6 at 44, 122; Ex. 1J at 38; Ex. 4 at 21.  Around June 28, 2018, Mr. Babcock had revision surgery on his left-hip replacement because it had loosened.  *See* dkt. 125 at 1–2 (Stipulation ¶ 7).

In this case, Mr. Babcock alleges that he was injured as a result of the BOP's negligence.  Dkt. 1.  Mr. Babcock alleges that during the first few months of his incarceration at FCI Terre Haute, he slipped and fell in the shower on two occasions—July 4, 2016 and again on August 16, 2016.  He also alleges that the treatment and medical care he was given by the BOP while incarcerated at FCI Terre Haute was inadequate.

At the bench trial, 12 witnesses testified: Mr. Babcock; six of his medical providers (Dr. Elizabeth Trueblood, Dr. Sami Jaafar, Physician Assistant ("PA")

Genevieve Daugherty,[2] PA Heather Mata, Physical Therapist ("PT") Ashley Matchett, and Registered Nurse ("RN") Matthew Worthington); an expert medical witness (Dr. Kevin Goebke); and four BOP officers and administrators (William Cope, Stephen Snyder, Michael Miller, and Jeff Lamping).  The parties stipulated to the admissibility of the following exhibits that were referenced during the trial: BOP medical records (Ex. 1A–K, 21–22); outside medical records (Ex. 2–4); Mr. Babcock's complaints (Ex. 5, 17–18); BOP administrative records (Ex. 6–7, 13–16); BOP policies (Ex. 8–9); photos and diagrams of BOP facilities (Ex. 10–12); Dr. Goebke's CV and expert report (Ex. 19–20); and summary exhibits (Ex. 23–25).

## II.
## Analysis

### A. Applicable law

Under the FTCA, a plaintiff may bring a civil action against the United States for damages arising from an injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  In other words, "the United States waives sovereign immunity under circumstances where local law would make a private person liable in

---

[2] PA Daugherty testified that a Physician Assistant is a mid-level provider that, like a physician, can diagnose and treat patients and order and interpret lab results.  Her last name is now "Muscatell"; the Court uses her former name because it appears in the medical records.

tort." *United States v. Olson*, 546 U.S. 43, 44 (2005) (emphasis omitted).  This provision allows "federal inmates [to] bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014).

Because liability under the FTCA hinges on "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), Indiana law governs liability, *see Molzof v. United States,* 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.").  Under Indiana law, a "plaintiff seeking damages for negligence must establish a duty owed to the plaintiff by the defendant, a breach of the duty, and an injury proximately caused by the breach of duty." *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011) (numbering omitted).

### B. Mr. Babcock's claims

Mr. Babcock argues that five "critical failures" amounted to negligence. First, that the BOP did not provide him with "basic accommodations" on his arrival to FCI Terre Haute.  Second, that the BOP did not maintain safe shower conditions in his unit, which led to his July 4, 2016 fall.  Third, that the BOP did not provide him with "reasonable and sufficient medical care" after this July 4 fall.  Fourth, that the BOP did not provide him with appropriate medical care after his August 16, 2016 fall.  And fifth, that the BOP did not provide appropriate medical care after a June 29, 2017, diagnosis of hip-replacement loosening.

### 1. Accommodations on arrival

Mr. Babcock contends that the BOP knew that he had hip replacement surgery approximately three months before he arrived at FCI Terre Haute, yet it failed to provide him with necessary accommodations, including a cane, crutches, a bottom bunk, and a first-floor cell. *See* dkt. 124 at 2. The United States responds that the BOP did not breach its duty of care. *See* dkt. 122 at 11.

### a. Findings of fact

It's uncontested that, when he arrived at FCI Terre Haute on June 16, 2016, Mr. Babcock was placed in a general population cell on the second floor in a top bunk and that he did not have walking-assistive devices like a walker, cane, or crutches with him in the facility. The parties contest, however, whether the BOP had sufficient notice of the severity of Mr. Babcock's mobility limitations when he entered BOP custody.

Mr. Babcock's "Intake Screening Form" asked whether there is "any reason that [he] should not be placed in general population"—he checked "No." Ex. 6 at 105. The form also asked if he "wish[ed] to self-identify . . . any disability, and/or self-perception of vulnerability," and he again checked "No." *Id.* At a health-screen appointment with a registered nurse on his intake day, the nurse did not record any "[c]urrent medical conditions" or treatments, and Mr. Babcock "[d]enied" any "[c]urrent painful condition" and the use of any "[p]rosthetic devices/equipment." Ex. 1A at 4–6.

Mr. Babcock also testified that while he had "slight pain" when he entered BOP custody, he was "actually doing well," "wasn't limping" when walking laps around the track, and "was progressing."  Indeed, the discharge instructions from his hip surgery from March—several months before he entered FCI Terre Haute—stated that he could "resume normal activity" and could shower five days after his surgery.  Ex. 5 at 7.

And although Mr. Babcock had several active prescriptions when he entered BOP custody, none were pain medications prescribed by the doctor who performed his left hip replacement.  *See* Ex. 5 at 3; Ex. 1A at 1–2 (listing Dr. Stirton as the prescriber for Tramadol, which was not on Mr. Babcock's active prescription list on June 8, 2016).  Mr. Babcock's general practitioner, Dr. Kevin Boyd, prescribed Mr. Babcock hydrocodone-acetaminophen, Xanax, carisoprodol; and a neurologist, Dr. Karna Sherwood, prescribed him gabapentin.  *See* Ex. 5 at 3; Ex. 1A at 1–2.  Dr. Trueblood, one of Mr. Babcock's treating physicians at FCI Terre Haute, testified that each of these medications was an "addictive" controlled substance, which concerned her that Mr. Babcock was "abusing drugs."  Dr. Trueblood also testified that the BOP never prescribes active medications without verifying them with a treatment provider.

And while Mr. Babcock testified that he brought a cane with him on arrival, the only recorded item of personal property in his possession on arrival was a pair of eyeglasses.  *See* Ex. 6 at 99 ("Inmate Personal Property Record" signed by Mr. Babcock on June 16, 2016).  In resolving the conflict between Mr. Babcock's testimony that he brought a cane with him to FCI Terre Haute

6

and the prison's records, the Court credits the latter.  First, Mr. Babcock testified inconsistently regarding other items in his possession, such as eyeglasses, at FCI Terre Haute.  Mr. Babcock testified that he did not receive glasses until a year after his arrival, but BOP records show that he received a new pair of glasses three months after his arrival, see Ex. 1C at 45.  Moreover, as discussed below, there are numerous other inconsistencies in Mr. Babcock's testimony that have the cumulative effect of discrediting his version of events. The Court does not credit Mr. Babcock's claim that prison officials confiscated a cane from him when he arrived at FCI Terre Haute and instead finds it more likely that Mr. Babcock did not have a cane with him upon arrival.

On June 17, 2016, Mr. Babcock had his first appointment with PA Daugherty.  *See* Ex. 1A at 26–27.  PA Daugherty testified that Mr. Babcock had a normal gait and did not report that he was disabled, unable to be housed in general population, or had any issues with his mobility.  *See id.*

On June 20, Mr. Babcock had an intake physical and reported that he had "pain all over—multiple joints, neuropathy," *id.* at 15, but he did not specifically report any difficulty walking.  Instead, PA Daugherty found that Mr. Babcock had a full range of motion in his spine and legs.  *See id.* at 20–22. She still ordered an x-ray of his left hip because of his history of "hip replacement," *id.* at 24, and he had this x-ray on June 22, 2016.  At trial, Mr. Babcock conceded that the results of this x-ray were "normal."  *See* Ex. 1B at 21.

And nothing in the record shows that Mr. Babcock requested an assistive device before the BOP gave him crutches on August 18, 2016. *See id.* at 22–23. Mr. Babcock's first documented request for a lower bunk in a first-floor cell is from September 9, 2016. Ex. 1C at 19–20. Although Mr. Babcock testified that he was not moved to a lower bunk until the "very end of [his] sentence," BOP records show that his "Medical Duty Status" was changed to reflect a lower bunk in a first-floor cell on September 13, 2016. *See id.*; Ex. 1K at 20; *see* Ex. 1F at 10; Ex. 1I at 28.

### b. Conclusions of law

"[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042," *United States v. Muniz*, 374 U.S. 150, 164–65 (1963), which requires the BOP to "provide suitable quarters and . . . for the safekeeping, care, and subsistence" for inmates, 18 U.S.C. § 4042(a)(2). However, there is "no hint that Indiana law would differ" from the federal statute in this context. *See Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008).

The "critical factor" in assessing whether a custodian breached its duty of care is how much notice it had of a risk to an inmate; other "relevant" factors include "[t]he condition of the inmate, the circumstances of the jail, and the extent of routine precautions." *Sauders v. Cnty. of Steuben*, 693 N.E.2d 16, 19 (Ind. 1998); *see Parrott*, 536 F.3d at 637 ("Applicable state tort law (here, the law of Indiana) governs whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries."). Notice of a risk to the

inmate is "critical" because a "defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured."  Restatement (Second) of Torts § 314A cmt. f.

Based on the above findings of fact, Mr. Babcock has not shown that the BOP had notice of any risk to Mr. Babcock or that he had a need for special accommodations when he entered its custody.  *See Sauders*, 693 N.E.2d at 19. As a result, the BOP acted reasonably at intake and thus did not breach the duty of care owed to Mr. Babcock.

To the extent that Mr. Babcock also alleges that the BOP did not accommodate his mobility limitations after the BOP had notice of his requests on September 9, 2016, Mr. Babcock has not shown a breach of the BOP's duty to provide him with reasonable care.  *See* 18 U.S.C. § 4042(a)(2).  After it had notice of his mobility limitations, the BOP acted reasonably by providing him with crutches by August 18, 2016, Ex. 1B at 21, medical shoes on September 8, 2016, Ex. 1C at 14, and a lower bunk in a first-floor cell on September 13, 2016, Ex. 1C at 19–20; Ex. 1K at 20; *see* Ex. 1F at 10; Ex. 1I at 28.  Therefore, Mr. Babcock has not shown that the United States breached its duty of care with respect to his accommodations on arrival.

## 2.  Shower conditions for the alleged July 4, 2016 fall

Mr. Babcock argues that the BOP did not maintain safe shower conditions in his cell block, which caused him to slip and fall on July 4, 2016. Mr. Babcock claims that the shower floor had several inches of standing water because the drain didn't work properly, that it was slippery because it had a lot

9

of soap buildup, that it lacked no-slip floor mats, that there was nothing to hold onto or a shower chair, and that he had to step over a tall "lip" to enter the shower.  Mr. Babcock contends that, but for the poor conditions the shower where he allegedly fell, at least some of his hip pain and eventual need for a hip replacement would not have occurred.

The United States responds that Mr. Babcock has not shown that he fell on July 4.  *See* dkt. 122 at 9.  The United States points to the lack of documentation and corroborating witnesses, and Mr. Babcock's inconsistent testimony.  *See id.*

### a.  Findings of fact

Mr. Babcock has offered conflicting accounts of the July 4 fall.  He testified that, *after* showering and getting his boxers on, he fell on the *concrete lipping* on the edge of the shower after his left leg got caught in his pant leg. Ex. 1B at 22 (emphasis added).  However, in his Notice of Tort Claim filed on July 20, 2016, he stated that he fell while "entering" the shower.  Ex. 5 at 1. And in his verified complaint in this case, Mr. Babcock stated that he fell "upon entry into the shower," "striking his head and neck on a metal protrusion in the shower," dkt. 1 at 3 ¶¶ 9, 11, which, at trial, he said was a "misconception."  Moreover, on August 8, 2016, PA Daugherty recorded that Mr. Babcock told her he "fell off [his] bunk about 1 month ago," not that he fell in the shower.  *See* Ex. 1B at 3–5.  And during his work-up for hip replacement surgery two years later—when he had a strong incentive to be truthful—Mr. Babcock "denie[d] any inciting trauma" for his left hip problems.  Ex. 4 at 8.

Mr. Babcock also testified that he told Officer Cope, who was on duty on the day of his fall, about "splotch[ed] blood" from the incident while holding a towel to his head, to which Officer Cope allegedly responded that he had already spoken to the medical department, which could not see him on July 4 because it was a holiday.  Yet Dr. Trueblood testified that a nurse is available 24/7, even on holidays.  And Officer Cope testified that his office was only about 10 feet from the shower, but he did not see or hear anything about a fall, observe visible injuries on Mr. Babcock, or see Mr. Babcock bleeding on that day.  Officer Cope described the prison's incident log for July 4, 2016, which contained over 20 incident entries but none for a fall.  *See* Ex. 13 at 11–12; Ex. 16 at 1–4; *cf*. Ex. 14 (August 16, 2016 log noting Mr. Babcock's other reported fall).  Officer Cope testified that he records anything significant that happens in his unit in that log, including visible head injuries and bleeding.  He cited an example from July 1, 2016, where he recorded in the log that a different inmate had complained that he was "urinating blood."  *See* Ex. 13 at 13.

And although Mr. Babcock testified that there is usually a line of 2–10 people waiting for the shower and that he complained about the shower to "anybody that would listen," Mr. Babcock has designated no evidence showing that others witnessed or heard about any difficulties he had with the shower or that he suffered from a fall in July 2016.  Indeed, Officer Miller, who also had an office close to the shower, testified that he did not recall Mr. Babcock falling in the shower or having problems entering, exiting, or using the shower.  Moreover, while Mr. Babcock testified that, in the afternoon of July 5, he

11

walked "all the way [to] the opposite side of the prison, about a block" to make commissary purchases, no witness testified that they saw Mr. Babcock with visible injuries or having difficulty walking at this time. *See* Ex. 12 (Map of Facility).

Officer Miller also testified about an informal grievance form that he filled out with Mr. Babcock the day after the alleged fall—July 5, 2016—that contained nothing about a fall or injuries from a fall; it reported only Mr. Babcock's complaint that his medications had been discontinued. *See* Ex. 17 at 1 (Mr. Babcock "states that his meds were discontinued for no reason" and that he requested "to have his meds that are prescribed.").

At trial, Mr. Babcock testified that this was "an accurate reflection" of his July 5 complaint and that his need for a "stronger pain medicine" was "really heavy on [his] mind" because he was hurting after the fall. Mr. Babcock conceded that he did not "put anything on there about the fall," claiming that he had already complained by other means. Officer Miller, who completed the grievance form for Mr. Babcock, also testified that Mr. Babcock did not complain about a fall during their interaction and that he did not recall seeing any visible injuries or bleeding. Officer Miller also testified that had Mr. Babcock reported a fall, injuries, or bleeding to him, he would have documented it and there likely would have been an investigation into the source of his injuries. The evidence does not support Mr. Babcock's claim that he reported an injury from a fall in July 2016 to prison officials, or that prison

12

officials were otherwise notified that Mr. Babcock had been injured in a fall around that time.

Mr. Babcock also had numerous interactions with administrative and medical personnel within a short time after the alleged July fall, and he did not mention a fall in any of those interactions.  From July 4 through July 13, 2016, Mr. Babcock emailed FCI Terre Haute's Health Services Department, Ex. 1A at 35–36, and saw a dentist and a psychologist, *see id.* at 39, 43, without mentioning a fall.  For example, at an appointment with a psychologist on July 11, Mr. Babcock noted that "he ha[d] not been sleeping well and continue[d] to experience chronic pain," but the report did not mention a fall or any recent aggravation of his injury.  *Id.* at 43.  It was not until July 13, over a week after the alleged incident, that Mr. Babcock emailed Health Services stating that he was in "extreme pain cause of hip replacement an[d] the fall in shower [he] had on July 4."  *Id.* at 44.

On July 19, Mr. Babcock was seen by Dr. Trueblood, whom Mr. Babcock testified was "kind and caring," for a "Chronic Care Clinic encounter," *see* Ex. 1A at 47, but Mr. Babcock's descriptions of the encounter do not match the medical records.  After an exam of his skin, head, neck, and shoulder, Dr. Trueblood recorded a large abdominal hernia but no other swelling or deformities.  *Id.* at 48–49.  Dr. Trueblood's notes recorded that Mr. Babcock's head was "atraumatic," *see id.*, and she testified that she did not observe a head injury on Mr. Babcock at this appointment.

13

Mr. Babcock, in contrast, testified that Dr. Trueblood "felt the knot on [his head]" that still had "a little bit of the scabbing" from the fall and told him that it was "quite a knot." In his Notice of Tort Claim filed on July 20, 2016, Mr. Babcock stated that Dr. Trueblood's July 19 examination "verified the contusion and abrasion to [his] head, noted the development of scarring and unsightly disfigurement," "noted localized pain and swelling in [his] []neck and upper back area, and attributed" all of this "to the injuries suffered at the time of the slip and fall accident." Ex. 5 at 2. Given the inconsistencies in Mr. Babcock's other testimony, the Court credits Dr. Trueblood's account and her contemporaneous records on this point over Mr. Babcock's testimony.

### b. Conclusions of law

Under Indiana law, negligence demands a "causal connection between the negligence and the hurt." *Peters v. Forster*, 804 N.E.2d 736, 739 (Ind. 2004) (citation omitted). "This element requires, at a minimum, causation in fact—that is, that the harm would not have occurred 'but for' the defendants' conduct." *Taylor v. Cmty. Hosps. of Indiana, Inc.*, 949 N.E.2d 361, 364 (Ind. Ct. App. 2011) (citation omitted); *see City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243–44 (Ind. 2003) (noting that causation has "two aspects": (1) "causation in fact" and (2) "scope of liability").

The evidence does not show that Mr. Babcock slipped and fell in the shower on July 4, 2016 or that any fall around that time at FCI Terre Haute caused his hip problems, so Mr. Babcock has failed to show causation.

### 3. Medical care after the alleged July 4, 2016 fall

Mr. Babcock contends that he did not receive reasonable and sufficient medical care for 15 days after he slipped and fell in the shower on July 4, 2016, despite having told correctional officers about his need for care, sending several emails requesting care, and visiting sick call numerous times. The United States responds that the BOP did not breach its duty to provide reasonable care. *See* dkt. 122 at 11.

### a. Findings of fact

The evidence does not show that Mr. Babcock fell in the shower in July 2016 or that he informed BOP employees of the alleged fall before July 13, 2016. *See* Ex. 1A at 44. Mr. Babcock testified that, on the morning of July 5, he went to "sick call"[3] at 6:00 a.m. and filled out a slip of paper about the incident to which the medical team told him that he would be "put on a call out."[4] Although BOP records include numerous sick call encounters with Mr. Babcock, *see, e.g.*, Ex. 1A at 45 (July 15, 2016), 59 (July 25, 2016); Ex. 1B at 15 (Aug. 15, 2016); Ex. 1C at 19 (Sept. 9, 2016), 24 (Sept. 13, 2016); Ex. 1F at 19 (Dec. 16, 2016); Ex. 1G at 32 (Mar. 6, 2017), there is no record of a sick call encounter on July 5. And RN Worthington testified that every sick call is

---

[3] Dr. Trueblood testified that FCI Terre Haute offers "sick call" triage encounters that resemble walk-in appointments with urgent-care centers four days per week. At these encounters, inmates can report any acute health problems or concerns about chronic ongoing problems. For more urgent problems and medical emergencies, inmates can be seen right away. But for other problems, inmates are scheduled for "call out" appointments in the future.

[4] PA Daugherty testified that a "call out" is like a pre-scheduled appointment with a medical professional.

logged in the BOP's medical records.  The Court therefore draws the reasonable inference that Mr. Babcock did not go to sick call on July 5.

Mr. Babcock notified Health Services about a fall on July 13, 2016, and was examined by Dr. Trueblood on July 19.  *See* Ex. 1A at 57.  After her examination, Dr. Trueblood ordered an x-ray of Mr. Babcock's spine, a physical therapy consult, and prescribed him several medications, including a prescription-dose of Naproxen, an anti-inflammatory pain medication.  *See id.* at 50, 57, 62–64.  Dr. Trueblood advised Mr. Babcock that, because of his history of substance abuse, she would not prescribe him narcotics because she did not want him to "substitut[e] one addiction for another."  At trial, Mr. Babcock testified that he has suffered from a "lifetime battle" with addiction and that his drug use contributed to his federal arrest, so her concerns were not without merit.

A few days later—on July 25, 2016—a radiologist concluded that there was "[n]o radiographic evidence for fracture or malalignment."  Ex. 1A at 62–63.  On August 8, PA Daugherty examined Mr. Babcock and prescribed him Elavil for his "unspecified" pain and requested an offsite pain management appointment for steroid injections, a neurosurgery evaluation of his neck, physical therapy for his hips, medical shoes, and neck pain.  Ex. 1B at 4–7.  PA Daugherty testified that he had a "normal" gait and that there were "no abnormal findings" at this exam.

On August 11, Mr. Babcock had an appointment with a physical therapist, PT Matchett.  Ex. 1B at 10.  At this appointment, Mr. Babcock

complained about his "thin mattress," that his "meds [were] taken away," and about the alleged July 4 fall in the shower.  *Id.*  PT Matchett noted that Mr. Babcock's gait showed "poor hip control in stance" and a "mildly limited" range of motion in his hip.  *Id.*  PT Matchett recorded that, if Mr. Babcock focused "more on his physical health, he can start to move better and feel better."  *Id.*

### b. Conclusions of law

Based on this record, Mr. Babcock has not shown that the BOP breached its duty of providing reasonable medical care between July 4 and August 16, 2016.  Dr. Goebke, the United States' expert witness who serves as the Interim Chief Medical Officer and Chair of the Family Medicine Department at Indiana University Health, testified that, based on his review of the medical records, Mr. Babcock received "excellent care" and "all of the resources [he] would expect" for a patient even outside the prison context.  *See Brock v. Wilson*, 727 F. App'x 857, 860 (7th Cir. 2018) ("Indiana typically requires expert medical testimony to determine whether a physician's conduct fell below the applicable standard of care.") (citation omitted).  And Mr. Babcock has not rebutted this expert testimony.  *See id.*  Even if the fall occurred, the BOP did not ignore any of Mr. Babcock's complaints.  *See id.* (finding that defendants did not "disregard [the inmate's] need for exams and treatment"); Ex. 25.  And the record shows that the BOP treated Mr. Babcock frequently with a variety of medical providers, diagnostic tools, and treatments.  *See id.*

Nevertheless, Mr. Babcock cites *Gilmore v. Decker*, No. 2:16-cv-00209, 2020 WL 1443198 (S.D. Ind. Mar. 25, 2020), in arguing that the BOP breached

its duty of care.  That case involved a FTCA claim against the BOP by an inmate who "suffered with extreme chest pain caused by a life-threatening medical condition in his cell without any medical attention or treatment for eleven days," a condition that ultimately required him to spend 50 days in the hospital due to multiple organ failures and face "a deathbed visit with his family."  *Id.* at *5–7.  That is a far cry from the situation here, where the evidence shows that the BOP responded to the medical conditions that Mr. Babcock communicated to it with a variety of tests and treatments from medical providers.

Therefore, Mr. Babcock's negligence claim based on any failure to treat between July 4 and August 16, 2016, fails because the BOP did not breach its duty of care.

### 4.  Medical care after August 16, 2016 fall

Mr. Babcock argues that the BOP did not provide sufficient medical care after he slipped and fell in a different cell block on August 16, 2016.[5]  He contends that he did not receive adequate medical care after this fall even though he emailed about his pain many times and told providers that he thought something was wrong with his hip replacement.  The United States responds that the BOP provided an appropriate level of care.  Dkt. 122 at 11.

---

[5] Mr. Babcock does not separately allege and has not introduced evidence that this block's shower conditions on August 16 constitute negligence, and Mr. Babcock's original BOP grievance and his complaint did not allege that this second fall caused his injuries.  Without evidence, the Court cannot reasonably infer that the shower conditions in this cell block was a cause of his injuries.

### a. Findings of fact

Between August 16, 2016 (the date of the second fall at issue) and June 29, 2017 (the first medical record identifying hip loosening), Mr. Babcock received appropriate medical treatment.  Two days after the fall—on August 18, 2016—Mr. Babcock had an x-ray on his left hip.  Ex. 1B at 17, 21.  A radiologist determined, after comparing the x-ray results to an x-ray from June 2016, that "[t]he hardware appear[ed] intact" with "[n]o acute fracture or dislocation identified" and no "evidence of hardware failure."  *Id.* at 21.

Also on August 18, Mr. Babcock had an appointment with PA Daugherty, who saw no "obvious hip deformity" and noted that Mr. Babcock had been given crutches.  Ex. 1B at 22–23.  She prescribed him a narcotic pain medication, Tylenol with Codeine ("Tylenol #3"), which he appears to have been prescribed consistently until March 2017, when Dr. Trueblood started tapering him off the medication.  *See id.* at 24; Ex. 1C at 7, 25; Ex. 1D at 8; Ex. 1E at 12; Ex. 1F at 13; Ex. 1G at 5, 21–22, 30, 46, 48–51.  PA Daugherty recorded that she offered him a cell on the first floor (a "low tier") at this appointment "but he refused saying that he didn't want to 'go through the trouble.'"  Ex. 1B at 22.  Although Mr. Babcock testified that his was "not true at all," the Court credits the testimony of PA Daugherty as corroborated by contemporaneous medical records over Mr. Babcock's testimony which, as noted above, is inconsistent in a number of areas and respects.

The next week, on August 25, Dr. Trueblood examined Mr. Babcock.  *See* Ex. 1B at 30.  She recorded that the x-ray "returned negative" and that Mr.

Babcock had been using "crutches mostly for stability due to hip pain." *Id.*
She recorded that his "left hip" had a "good" range of motion and that she
performed an exam of, among other things, his skin, head, and neck, with no
abnormalities recorded. *See id.* at 31–32 (recording head as "Atraumatic" and
"[n]o contusions noted"). Dr. Trueblood prescribed Mr. Babcock two anti-
inflammatory medications (Medrol and Ibuprofen) in addition to his
prescription for Tylenol #3. *Id.*

On September 1, Mr. Babcock had a physical therapy appointment with
PT Matchett, who approved him for medical shoes and recommended a consult
with an orthopedist to review and evaluate his left hip pain. Ex. 1C at 2–4.
Thereafter, Mr. Babcock regularly had appointments with PT Matchett. *See id.*
at 32 (Sept. 15, 2016); Ex. 1D at 4 (Oct. 6, 2016); Ex. 1E at 4 (Nov. 3, 2016);
Ex. 1F at 1 (Dec. 1, 2016); Ex. 1G at 7 (missed appointment on Jan. 12, 2017),
16 (Jan. 26, 2017), 28 (Mar. 3, 2017), 35 (Mar. 9, 2017); Ex. 1H at 14 (Apr. 13,
2017), 83 (June 22, 2017).

On September 6, 2016, an "ankle-brachial index" test was conducted,
which did not reveal any "evidence of remarkable arterial vascular obstructive
disease to lower extremities." Ex. 1C at 9–10. On September 13, a family
nurse practitioner examined Mr. Babcock, increased his Tylenol #3 dosage for
"ongoing pain," updated his "Medical Duty Status," and re-issued him
crutches. *Id.* at 25; Ex. 1K at 1, 20.

On September 15, Mr. Babcock had an outside consultation with Dr.
Gary Ulrich, an orthopedic surgeon. Ex. 1C at 28. Dr. Ulrich evaluated his left

20

hip, which "involve[d] [an] exam and x-ray." *Id.* This exam noted a "good range
of motion of his hip," and the x-ray "reveal[ed] a non-cemented hip arthroplasty
in good position" with "no current prosthetic fractures noted." *Id.*

Mr. Babcock argues that a second opinion from Dr. Jafaar on June 29,
2017—concluding that there was loosening of Mr. Babcock's hip replacement—
showed that Dr. Ulrich (and thus the BOP physicians) "missed" the loosening
at this appointment.  But that conclusion is not supported by the evidence.
First, Dr. Jafaar testified that he did not know when the x-ray he reviewed in
June 2017 had been taken, and Mr. Babcock has designated no evidence that
Dr. Jafaar looked at a previous x-ray instead of, for example, reading an x-ray
taken on the same day of his examination in June 2017.  Moreover, Dr. Jafaar
testified that hip failure due to loosening or infection is "very rare" and that
loosening "can be very subtle to determine."  Even if Dr. Ulrich and Dr. Jafaar
had reviewed the same x-ray image, Dr. Jafaar's belief that the x-ray showed
loosening of the replacement does not itself show that Dr. Ulrich "missed
something."

On October 14, Mr. Babcock received CT scans of his head and neck.
Ex. 1D at 7.  The results of the CT scan of his head were "unremarkable,"
*id.* at 10, and the neck CT scan showed "reasonable alignment and position
without recurrent central or neural foraminal narrowing," *id.* at 13.

On November 28, PA Daugherty examined Mr. Babcock and, after he
requested "something stronger for pain" than Tylenol #3, PA Daugherty

increased Mr. Babcock's Elavil dosage but declined to prescribe him additional narcotics.  Ex. 1E at 16.

On December 6, Mr. Babcock had a neurosurgery consult for neck pain. Ex. 1F at 5–8.  The neurologist reviewed a new CT scan that showed arthritis in his spine but no pinched nerves.  *Id.*  He did not recommend surgery.  *Id.*

On December 14, Mr. Babcock had a pain-management consultation with a doctor for steroid injections.  *Id.* at 15–18, 23.

On January 4, 2017, Mr. Babcock met with a general surgeon about an operation to remove the painful hernia that Dr. Trueblood had identified the previous summer.  Ex. 1G at 2, 11.

On January 13, Mr. Babcock met with PA Mata, and she reported that he had a "normal gait."  *Id.* at 8.  PA Mata testified that she did not prescribe Mr. Babcock a higher dose of Tylenol #3 because he was already on the maximum dose.

On February 2, Mr. Babcock received a TENS unit[6] for pain.  Ex. 1G at 20; *see* Ex. 1K at 1.

On February 15, Mr. Babcock had a CT scan of his left hip, which showed that his hip replacement was "intact" and "in good alignment and position" and that the "soft tissues around the left hip [we]re unremarkable." Ex. 1G at 24–25.  Both Dr. Trueblood and Dr. Goebke testified that a CT scan is more sensitive and definitive than an x-ray.

---

[6] PT Matchett testified that a TENS ("Transcutaneous Electrical Nerve Stimulation") unit is an electrical device that can be used to help treat pain.

On March 6, PA Mata examined Mr. Babcock at sick call, Ex. 1G at 32–34, and PA Mata testified that she told Mr. Babcock that the CT scan showed "no abnormalities with the hip joint."  However, Mr. Babcock told her that the "machine was broken and that the report [wa]s false."  Ex. 1G at 32.  On April 4, Mr. Babcock received a cervical epidural steroid injection for pain, primarily neck pain.  Ex. 1H at 1–2.

On April 11, Mr. Babcock had a chronic care appointment with Dr. King, an osteopathic physician, who denied Mr. Babcock's request for "narcotics (vicod[i]n)" because that kind of medication was only used for "acute pain," not "chronic pain," and that the goal was "pain management . . . NOT [the] total absence of pain."  Ex. 1H at 8–10.  Mr. Babcock "refused" Dr. King's recommendation for an orthopedic consult and for other "chronic pain meds such as Tegretol, etc.," and Dr. King recorded an "[o]bjective pain level" as a "0-3/10."  *Id.*

On April 13, PA Mata examined Mr. Babcock and requested an orthopedist consultation after Mr. Babcock told her he had changed his mind about refusing a consult.  Ex. 1H at 16–17.

On April 17, Mr. Babcock had surgery to repair his hernia.  *See id.* at 19–30, 36–42; Ex. 3 at 3.  He received opioid pain medications after the procedure.  Ex. 1H at 26–30, 33.

On April 24, PA Mata examined Mr. Babcock and, after he asked why the Tylenol #3 tablets were "being weaned off," she told him that narcotics are not for long-term use.  *Id.* at 45–48.

On May 24, Mr. Babcock had a follow-up appointment for his hernia surgery.  *Id.* at 65.

On May 30, Mr. Babcock had an electromyography ("EMG") test, and the results were "normal" and did not show evidence of "neuropathy," "myopathic process," or "denervation."  *Id.* at 70; Ex. 1I at 45 (physician calling these results "completely normal").

### b.  Conclusions of law

The evidence shows that Mr. Babcock received numerous pain medications, a steroid injection, treatment with a TENS unit, crutches, medical shoes, a lower tier and bunk pass, and physical therapy after his complaints of hip pain.  And he had numerous tests of his hip, including multiple x-rays, CT scans, an EMG, and numerous consults with medical providers.  The Court does not credit Mr. Babcock's claim that numerous medical records are inaccurate or that one x-ray machine was "outdated" and that another was "broken."  Mr. Babcock has offered no evidence, but only his unsupported conclusions, to question the accuracy of these contemporaneously documented, routine medical records.  He also has not presented evidence showing bias, motive, or some other reason to question the credibility of the medical professionals who used those machines, interpreted the results, and created the medical records.

And Mr. Babcock has not offered any evidence that a reasonable medical provider needed to prescribe stronger narcotic pain medication.  Indeed, PA Mata testified that Mr. Babcock was on the maximum dose of Tylenol #3, and

24

Dr. Trueblood testified that Tylenol #3 is the "primary" narcotic prescribed at the BOP and that Percocet (Oxycodone with Tylenol) is prescribed only for "acute" surgeries and severe, acute pain. Moreover, Dr. Goebke testified that "the worst thing that [doctors] can do is treat pain" with opioid narcotics without an "associated diagnosis" because it could cause additional health problems, including opioid addiction. To avoid these problems, Dr. Goebke testified, the goal is to prescribe the lowest dosage of narcotics for the shortest period. That's what the BOP medical providers did.

The Court therefore agrees with Dr. Goebke's assessment that Mr. Babcock received "all of the resources he would expect" before June 29, 2017, the first date with objective evidence of hip loosening. As a result, the BOP did not breach its duty to provide reasonable medical care for this period.

### 5. Medical care after first objective evidence of hip loosening

Mr. Babcock argues that the BOP failed to alleviate his pain, even after Dr. Jafaar (and later—on February 20, 2018—another physician) concluded that his left hip replacement had loosened on June 29, 2017. He also points to the government insurance's denial of coverage for revision surgery as evidence of this negligence. The United States responds that it provided an appropriate level of care. Dkt. 122 at 11.

### a. Findings of fact

On June 29, 2017, Mr. Babcock had an appointment with Dr. Sami Jaafar, an orthopedist. Ex. 1H at 88–90. After reviewing x-rays on file and examining Mr. Babcock, Dr. Jafaar recorded that these complications were

"likely due to loosening" that would likely "require revision."  *Id.* at 88–90 (note stating that Dr. Jafaar "believe[d] that the cup may be loose," which could require "major surgery again to fix," but that he "[w]ould need more testing to confirm what is suspected").  This is the first medical record identifying hip loosening.

Dr. Jaafar noted a recommendation for two workups (one for infection and the other for loosening) but Mr. Babcock declined.  *See id.* at 88–90.  Mr. Babcock testified that he did not want to have a medical hold placed on him since he was going to be released soon and would rather get the surgery after he left FCI Terre Haute.  *See id.*

Mr. Babcock testified that Dr. Jaafar also told him that he had "been right all along" and that the BOP "should have caught it before."  But Dr. Jafaar testified that he did not say that and "certainly would not have said that."

On July 6, PA Mata examined Mr. Babcock, who reiterated that he did "not want surgery done until" his release but that he did want "narcotic pain medicine."  Ex. 1I at 1.  The record states that PA Mata told him that narcotics were not proper "to treat chronic pain," and Mr. Babcock was "very upset that he [wa]s not being given narcotics."  *Id.*  PA Mata testified that he said he only "wanted more narcotic medicine" and "did not want surgery prior to his release."

On July 18, PA Mata examined Mr. Babcock, renewed his Elavil prescription, and referred him for a second epidural steroid injection.  Ex. 1I at 5–6.

On August 1, PA Mata examined Mr. Babcock, who "refuse[d] any" of the options she offered for his hip pain, "stating that they [we]re not going to help," and he refused a workup because he did "not want[] a medical hold."  *Id.* at 21–23.  PA Mata testified that she had offered him multiple options to try to help his chronic pain besides narcotics, but he was "not willing to try any of them."

On September 28, Mr. Babcock had a chronic care visit with a physician. Ex. 1I at 45–49.  Mr. Babcock requested to be placed back on Tylenol #3 for "severe" hip pain, but the physician declined because he did "not appear to be in that severe of pain" and was already taking Ibuprofen and Elavil.  *Id.* However, the physician prescribed Oxcarbazepine as an additional medication for the pain.  *Id.*

On November 3, x-rays revealed that Mr. Babcock had a bone spur on his left heel but his foot was otherwise "unremarkable," and his left knee had "[v]ery minimal osteoarthritis" but was otherwise "unremarkable."  Ex. 1J at 1–2.

On November 5, Mr. Babcock received another epidural steroid injection. *Id.* at 7.

On November 19, PA Mata examined Mr. Babcock, and he requested another steroid injection.  *Id.* at 18.

27

On December 14, Mr. Babcock transferred from FCI Terre Haute to a residential reentry center in St. Louis.  *Id.* at 38; *see* Ex. 6 at 122.  He testified that, at this facility, he had a first-floor room without bunk beds and a "really nice" handicap-accessible bathroom with rails.

On February 20, 2018, Mr. Babcock had another x-ray of his hips done, which was compared to an x-ray done on March 9, 2016.  Ex. 4 at 7–9.  This showed that there was a "failed acetabular component," which was "likely [the] source of his hip pain."  *Id.*  Although the stem "was in good position without loosening," the "cup ha[d] obviously loosened," which would "require revision before he gets any relief of pain."  *Id.* at 9.

Mr. Babcock was scheduled for a left-hip revision in May, but that surgery was cancelled "when his state funded insurance denied the surgery." *Id.* at 21–22; *see id.* at 29 ("Surgery denied per BOP" on April 24, 2018).

Mr. Babcock was released from BOP custody on June 6, 2018.  *See id.* at 21.  He later received surgery on his left hip after his release later that June. *See* dkt. 125 at 1–2 (Stipulation ¶ 7).

### b.  Conclusions of law

Based on this evidence, the BOP acted reasonably in providing Mr. Babcock medical care during this period.  Mr. Babcock refused to proceed with surgery to fix his hip replacement from June 29, 2017, through at least February 20, 2018.  *See* Ex. 1H at 89; Ex. 1I at 1.  And he has not offered evidence that a reasonable physician was required to prescribe narcotic pain medications during this time.  Indeed, Mr. Babcock either received or was

offered alternative pain treatments through this period.  *See* Ex. 1I at 5–6 (Elavil); Ex. 1J at 7 (epidural steroid injection), 18 (Oxcarbmazepine). Moreover, although Mr. Babcock's insurance denied coverage surgery on April 24, 2018, *see* Ex. 4 at 21–22, 29, Mr. Babcock has not offered details about that coverage refusal or the BOP's insurance-coverage obligations when an inmate is at a residential reentry center.  Indeed, Mr. Babcock testified that he does not know why coverage was denied for the surgery.  Regardless, Mr. Babcock was released from BOP custody just over a month later, at which point he was free to—and did—obtain the hip revision surgery on his own. Because the BOP provided Mr. Babcock with reasonable medical care, it did not breach its duty to him for this period.  *See Brock*, 727 Fed. App'x at 860.

### III.
### Conclusion

For the reasons described above, Mr. Babcock has not shown that the BOP was negligent.  Therefore, he is not entitled to relief under the FTCA. Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 8/19/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

EUGENE RAY BABCOCK
113 Clover Street
Moro, IL 62067

Kathleen L. Matsoukas
BARNES & THORNBURG, LLP (Indianapolis)
kmatsoukas@btlaw.com

Kelly Rota
U.S. ATTORNEY'S OFFICE OF THE SOUTHERN DISTRICT OF INDI
kelly.rota@usdoj.gov

Allison Marie Scarlott
BARNES & THORNBURG LLP
allison.scarlott@btlaw.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov